AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

RAYNARD SCOTT,

Defendant

Case No.

LA19MJ01683

FILED
CLERK, U.S. DISTRICT COURT
APR 2 3 2019
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 31, 2019, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and Ammunition |

This criminal complaint is based on these facts:

Please see attached affidavit.

☒ Continued on the attached sheet.

/s/
Complainant's signature

David Gonzalez, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 4/23/19

City and state: Los Angeles, California

CHARLES F. EICK
Judge's signature

Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

AUSA: Carolyn Small x2041

## AFFIDAVIT

I, David Gonzalez, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for Raynard Scott ("SCOTT") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition.

2. This affidavit is also made in support of an application for a warrant to search the person of SCOTT, as described more fully in Attachment A, for evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm and Ammunition) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and am currently assigned to the Los Angeles Field Division. Since April 2018, I have actively participated in cases involving prohibited persons possessing firearms, persons trafficking firearms and controlled substances, persons possessing illegal firearms, and persons involved in gang activity. I have also interviewed confidential informants, witnesses, cooperators, defendants, and other persons engaged in violations of federal law.

5. I have completed the 12-week Criminal Investigator Training Program and the 12-week Special Agent Basic Training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. I have also attended and completed the ATF National Academy in Glynco, Georgia. My training at FLETC included specialized training regarding violations of the Gun Control Act and the Controlled Substance Act. That specialized training covered topics such as surveillance, interviewing, warrant writing, evidence handling, arrest procedures, search procedures, and testifying in court.

## III. SUMMARY OF PROBABLE CAUSE

6. On March 31, 2019, officers from the Los Angeles Police Department ("LAPD") stopped a car driven by SCOTT and found a loaded pistol on the front passenger seat. SCOTT was the sole occupant of the car at the time the officers found the pistol. Prior to March 31, 2019, SCOTT had been convicted of

several felony crimes punishable by a term of imprisonment exceeding one year.

### IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Traffic Stop of SCOTT**

8. On March 31, 2019, at approximately 9:20 p.m., LAPD Officers Ramirez and Harrison were patrolling the area of Wadsworth Avenue and 84th Street in Los Angeles, California, when Officer Ramirez saw a car traveling west on 84th Street. The car was traveling at an estimated speed of 40 miles per hour in a 25-mile-per-hour residential area, in violation of California Vehicle Code § 22350 (Unsafe Speed for Conditions).

9. The officers pulled behind the car and followed it. Once behind the car, the officers saw that it had no license plates, in violation of California Vehicle Code § 5200(a).

10. The officers initiated a traffic stop by activating their vehicle emergency equipment. The driver of the car, later identified as SCOTT, did not initially pull to the right and stop, but instead continued to drive a distance. SCOTT then turned left into the driveway of 8402 S. Avalon Boulevard and stopped.

### B. Officer Harrison Sees a Firearm in Plain View Inside SCOTT's Car

11. After SCOTT stopped, he got out of the car on the driver's side. Officer Ramirez ordered SCOTT to stop and walk to a nearby fence, which SCOTT did.

12. Officer Harrison approached SCOTT's car on the passenger side to see if there was anyone else inside the car. As he looked inside the passenger-side windows of the car with a flashlight, Officer Harrison saw a stainless steel pistol in plain view on the front passenger seat. There was no one else inside the car.

13. The officers retrieved the pistol from the passenger seat and rendered it safe by unloading it. In rendering the pistol safe, the officers discovered that it was loaded with 13 rounds of ammunition.

14. After the officers arrested SCOTT for possessing a loaded firearm in a vehicle, in violation of California Penal Code § 25850, they searched his car. The officers found no additional evidence or contraband in the car.

### C. SCOTT's Criminal History

15. On or about April 15, 2019, I reviewed certified conviction documents for SCOTT and learned that SCOTT has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. On or about November 6, 1985, a violation of California Health & Safety Code § 11352 (Transporting/Selling a

Controlled Substance), in the Superior Court for the State of California, County of Los Angeles, Case Number A771154;

  b. On or about January 5, 1987, a violation of California Penal Code § 12021(a) (Felon in Possession of a Firearm), in the Superior Court for the State of California, County of Los Angeles, Case Number A788930;

  c. On or about June 12, 1989, a violation of California Penal Code § 12021(a) (Felon in Possession of a Firearm), in the Superior Court for the State of California, County of Los Angeles, Case Number A985577;

  d. On or about December 4, 1990, a violation of California Health & Safety Code § 11350(a) (Possession of a Controlled Substance), in the Superior Court for the State of California, County of Los Angeles, Case Number BA023826;

  e. On or about November 25, 1991, a violation of California Health & Safety Code § 11351 (Possession for Sale of a Controlled Substance), in the Superior Court for the State of California, County of Los Angeles, Case Number VA012574;

  f. On or about December 27, 2004, a violation of California Health & Safety Code § 11351.5 (Possession for Sale of Cocaine Base), in the Superior Court for the State of California, County of Los Angeles, Case Number BA275589; and

  g. On or about October 30, 2014, a violation of California Health & Safety Code § 11351.5 (Possession for Sale of Cocaine Base), in the Superior Court for the State of California, County of Los Angeles, Case Number BA418980.

D.  **Interstate Nexus**

16. On April 17, 2019, an ATF Interstate Nexus Expert examined the pistol and ammunition and confirmed that the thirteen rounds of ammunition were manufactured outside of the State of California. Because the ammunition was recovered in California, I believe that it has traveled in and affected interstate or foreign commerce.

17. The ATF Interstate Nexus Expert determined that the pistol was manufactured in California. However, the firearm trace history for the pistol shows that in 1994, the pistol was purchased from a federal firearms licensee in Wyoming. Because the pistol was previously purchased in Wyoming and recovered in California, I believe that it has traveled in and affected interstate or foreign commerce.

V.  **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

18. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

   a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and often keep them under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such

information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

10

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SCOTT's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of SCOTT's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

23.   For all of the reasons described above, there is probable cause to believe that SCOTT has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm and Ammunition. There is also probable cause that the items to be

seized described in Attachment B will be found in a search of the person described in Attachment A.

/s/
David Gonzalez, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed to and sworn before me this 23rd day of April, 2019.

CHARLES F. EICK

HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE